UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **INVISIBLE FENCE, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-361 |
| | ) | |
| **PERIMETER TECHNOLOGIES, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Invisible Fence, Inc. manufactures and sells the Power Cap, a battery pack used to supply power to a receiver that attaches to an animal's collar and that generates a shock if the animal gets too close to a buried wire. Invisible Fence sued Defendant Perimeter Technologies, Inc., claiming that Perimeter violated the Lanham Act, 15 U.S.C. § 1125(a), by manufacturing and selling a similar battery pack that allegedly infringes upon Invisible Fence's trade dress interest in the Power Cap.[1]

On October 31, 2006, Perimeter filed a motion for summary judgment, maintaining that Invisible Fence's Power Cap is not entitled to trade dress protection as a matter of law. (Docket # 54.) On November 20, 2006, Invisible Fence filed a response, and Perimeter replied on December 15, 2006. (Docket ## 56, 61.)

For the following reasons, Perimeter's motion for summary judgment on the trade dress

---

[1] Invisible Fence also sued Perimeter for patent infringement, trademark infringement, and unfair competition (Compl. 2-8), but apparently only the trade dress and patent claims remain. (Def. Perimeter Technologies, Inc.'s Mem. in Supp. of Its Mot. for Summ. J. of No Trade Dress Infringement ("Mem. in Supp.") 2.) The patent law claims are the subject of two motions for summary judgment (Docket ## 50, 62), which will be addressed in separate orders.

infringement claim will be GRANTED.

## I. FACTUAL BACKGROUND[2]

Invisible Fence manufactures and sells the Power Cap, which is a battery pack that powers an electronic receiver worn by an animal as part of an electronic pet containment system. The Power Cap is removable from the receiver so that the battery can be easily replaced. To facilitate battery replacement, a "coin slot" is located at one end of the Power Cap. The coin slot is an indentation formed by two raised ridges that allows a coin to be inserted and turned to either lock a new battery into place or to unlock and remove an old battery. The following are pictures of the Power Cap:

  

(Mem. in Supp. 17.)

Several of Invisible Fence's instruction manuals describe how the coin slot facilitates replacement of the Power Cap. For example, a publication entitled "Installation & Training Manual For The Invisible Fence AT950 In-Home Pet System" provides that to remove an old

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Invisible Fence, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Insofar as Invisible Fence does not controvert the facts asserted by Perimeter in its "Statement of Material Facts," Perimeter's facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

Power Cap from the receiver, "use a small, thin coin in the slot on top of the battery and turn it counter clockwise. The battery will rotate up and out of the battery chamber." (Mem. in Supp., Ex. 14.) It also instructs that the last step when installing a new Power Cap is to "use a small, thin coin in the slot on the top of the battery to turn the battery clockwise until the slot on the top of the battery is lined up with the two small raised tabs on the bottom of the receiver." (Mem. in Supp., Ex. 14.) These instructions are accompanied by the following diagram:



(Mem. in Supp., Ex. 14.)

In addition, Invisible Fence manuals entitled "Installation and Service 2002" and "Invisible Gate Operation and Installation Manual" use essentially the same language when describing how to remove or install the Power Cap, although they do not include the same diagrams as the "Installation & Training Manual For The Invisible Fence AT950 In-Home Pet System." (*See* Mem. in Supp., Exs. 12, 13.)

Invisible Fence also owns United States Patent Number 5,445,900 ("'900 Patent") for an invention that "generally relates to an electronic device having a removable battery pack assembly and, more specifically, to a battery pack for supplying power to an electronic receiver

having a receptacle for the battery pack."[3] '900 Patent col.1 l.6-10 (filed Aug. 18, 1993). The

'900 Patent explains that the removeability of the battery pack "solves the problems associated

with battery replacement in electronic receivers of the type used in electronic pet containment

systems." '900 Patent col. 1 l. 43-46. The Power Cap lists the '900 Patent on the bottom of its

packaging, and an Invisible Fence brochure addressed to its "network member[s]" states that the

Power Cap is patented. (Mem. in Supp., Exs. 5, 6.)

Regarding the coin slot, Claim 6 of the '900 Patent describes a "battery pack . . . wherein

the base of the battery holder comprises an external slot for receiving a tool to facilitate insertion

of the battery holder into the electronic receiver." '900 Patent col. 10 l. 42-45. Furthermore, the

"Detailed Description of the Preferred Embodiments" specifically details the coin slot:

> An external slot . . . is provided in the base . . . of the battery holder to receive a
> tool to assist the user during insertion and removal of the battery pack . . . . The
> slot is rounded allowing the use of a coin to lock or unlock the battery pack . . . .
> After inserting a coin into the slot . . . , the battery pack . . . is turned in a
> clockwise direction to lock [the] battery pack . . . into the receptacle . . . of the
> receiver housing . . . . Similarly, turning the battery pack . . . in a counter-
> clockwise direction unlocks the battery pack . . . .

'900 Patent col. 9 l. 21-30. The following Figures illustrate the invention's preferred

embodiment:

---

[3] Invisible Fence also owns United States Patent Number 5,476,729 ("'729 Patent"), which is a
continuation-in-part of the '900 Patent. *See* '729 Patent (filed Jan. 14, 1994). Insofar as the relevant language of both
patents is the same, for ease of reference the Court cites only to the '900 Patent.



'900 Patent figs. 2, 8, 9.

Significantly, the coin slot (# 56) as depicted in Figs. 8 and 9 is simply an indentation into the base of the battery pack; the indentation does not have two raised ridges alongside it, unlike the coin slot in Invisible Fence's Power Cap.

Invisible Fence now claims that Perimeter infringed its trade dress interest in the Power Cap.[4] Specifically, Invisible Fence maintains that Perimeter's battery pack contains two similar raised ridges at the cap end. Invisible Fence argues that this design similarity leads to a significant likelihood that consumers will confuse its Power Cap with Perimeter's battery pack. In support of this position, Invisible Fence points to a survey conducted by their expert in which twenty-nine percent of respondents answered that due to similarities in battery appearance, the Perimeter battery is actually sold by Invisible Fence. (Aff. of Robert N. Reitter, Ex. A.)

## II. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of

---

[4] Invisible Fence's trade dress interest in the Power Cap is not registered on the Principal Register at the United States Patent and Trademark Office.

material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

### III. DISCUSSION

### A. General Principles

"The term trade dress refers to the 'appearance of a product when that appearance is used to identify the producer.'" *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005) (quoting *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 338 (7th Cir. 1998)). Although federal law protects a product's trade dress, "in many instances there is no prohibition against copying goods and products." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). Indeed, "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." *Id.* Accordingly, a plaintiff can prevail on a claim of trade dress infringement only when: 1) the plaintiff's trade dress is "inherently distinctive" or

6

has acquired a "secondary meaning"; 2) the similarity of the defendant's trade dress creates a likelihood of consumer confusion between the two products; and 3) the plaintiff's trade dress is nonfunctional. *See Incredible Techs*, 400 F.3d at 1015; *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1067-68 (7th Cir. 1992).

## B. Invisible Fence Fails to Create a Genuine Issue of Material Fact that Its Coin Slot is Nonfunctional

The focus of the parties' debate is whether the features of the Power Cap, particularly the two raised ridges forming the coin slot, are functional. In that regard, the party asserting protection for an unregistered trade dress ultimately bears the burden of demonstrating that its trade dress is nonfunctional. *TrafFix*, 532 U.S. at 32; 15 U.S.C. § 1125(a)(3). However, on a motion for summary judgment, all that Invisible Fence is required to do is raise a genuine issue of material fact that its trade dress is nonfunctional.[5] *See, e.g.*, *Puritan-Bennett Corp. v. Penox Techs., Inc.*, No. IP02-0762-C-M/S, 2004 WL 866618, at *33 (S.D. Ind. March 2, 2004) ("To avoid summary judgment on its trade dress infringement claim, [plaintiff] must evidence a material issue of fact exists . . . that the . . . trade dress is nonfunctional."); *Antioch Co. v. W. Trimming Corp.*, 196 F. Supp. 2d 635, 643 (S.D. Ohio 2002); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001) ("In sum, [plaintiff] presented evidence sufficient to raise an issue of fact that the trade dress . . . is nonfunctional.").

---

[5] Both parties seemingly misconstrue the burden of proof on a motion for summary judgment in a trade dress claim. Invisible Fence ostensibly places the burden of proof on Perimeter, arguing, for example, that "[t]here is no showing [by Perimeter] that the two (2) raised ridges running along the base of the Invisible Fence Battery are costly to design around or do without, or are essential to the use of purpose of the battery pack." (Mem. in Opp'n to Mot. for Summ. J. of No Trade Dress Infringement ("Mem. in Opp'n") 4.) Perimeter, however, places too high a burden on Invisible Fence at this stage of the proceedings, continually asserting that "Invisible Fence must *prove* that the coin slot is not functional." (Def. Perimeter Technologies, Inc.'s Reply to Pl. Invisible Fence, Inc.'s Opp'n to its Mot. for Summ. J. of No Trade Dress Infringement ("Reply") 4 (emphasis added).)

7

In *TrafFix*, the Supreme Court advanced the so-called "traditional rule" of functionality, defining a feature as functional "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." 532 U.S. at 33. Before *TrafFix*, some courts employed a "necessity test" of functionality, defining a feature as functional when the exclusive use of the feature "put competitors at a significant non-reputation-related disadvantage." *Id.* Although the Court did not preclude the use of the "necessity test," it held that if a feature is deemed functional under the traditional rule, "there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33.

Invisible Fence advances only one argument in support of its position that its trade dress is nonfunctional–the two raised ridges forming the coin slot are not essential to the use or purpose of the Power Cap because alternative designs could similarly facilitate installation and removal of the battery pack. As an example of such an alternative, Invisible Fence points to Figs. 8 and 9 of the '900 Patent, in which the coin slot is merely an indentation with no raised ridges. Furthermore, Invisible Fence contends that the coin slot feature itself is not essential, as "Perimeter could [have] utilize[d] a raised projection at the cap end with a square of hex shape for engaging with a wrench." (Mem. in Opp'n 6.)

Perimeter counters that the Supreme Court's decision in *TrafFix* precludes this Court from considering design alternatives. Although the Court ultimately agrees with Perimeter that under *TrafFix* we do not need to consider Invisible Fence's proffered alternatives, a brief survey of the legal landscape both prior to and after the *TrafFix* decision is useful to understand the role of design alternatives in deciding issues of functionality.

Prior to *TrafFix*, the Seventh Circuit was among many courts who ruled that the

8

availability of alternative designs was an important evidentiary key when deciding issues of functionality. *See e.g.*, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 299 (7th Cir. 1998) ("When there are numerous possible constructions of a product, the nature, price, and utility of such constructions are material issues of fact not well-suited for determination at the summary judgment stage."); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:75 (4th ed. 2001) (collecting cases). However, in *TrafFix*, the Supreme Court questioned the utility of examining such alternative designs, finding that once a feature is deemed functional under the traditional rule, "[t]here is no need . . . to engage . . . in speculation about other design possibilities . . . which might serve the same purpose." 532 U.S. at 34.

Following *TrafFix*, there has been much debate surrounding the proper role of alternative designs when analyzing a feature's functionality. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 546 (S.D.N.Y. 2003) (noting that "the exact holding of *TrafFix* on this point is highly elusive"). For example, the Fifth Circuit has deemed evidence of alternative designs to be completely irrelevant to the functionality inquiry. *See Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002). In contrast, the Federal Circuit found that the availability of alternative designs is still a relevant factor in the functionality analysis:

> Nothing in *TrafFix* suggests that consideration of alternative designs is not properly part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant. *Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available.* But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1276 (Fed. Cir. 2002) (emphasis added); *see also* McCarthy, § 7:75 ("I cannot believe that the Supreme Court in *Traffix* meant, in this back-handed way, to overrule decades of precedent which has used alternatives as another source of evidence to resolve the difficult puzzle of functionality.").

Other courts have placed the alternative design inquiry under the penumbra of the necessity test, concluding that "if a product is clearly functional under [the traditional rule], a court need not apply the competitive necessity test and its related inquiry concerning the availability of alternative designs." *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 156 (6th Cir. 2003) ("[A]t the very least, a court is not *required* to examine alternative designs when applying the traditional test for functionality."); *Au-Tomotive Gold, Inc. v. Volkwagen of Am., Inc.*, 457 F.3d 1062, 1071-72 (9th Cir. 2006) ("If a design is determined to be functional under the traditional test . . . there is no need to go further to consider indicia of competitive necessity, such as the availability of alternative designs.").

Although the Seventh Circuit has yet to place its iron in the fire regarding this issue, it is apparent from *TrafFix* and the resulting jurisprudence that if functionality can be conclusively established under the traditional rule, then courts need not consider a plaintiff's design alternatives. *See John M. Middleton, Inc. v. Swisher Int'l, Inc.*, Civil Action No. 03-3908, 2006 WL 2129209, at *5 (E.D. Pa. July 26, 2006) ("The availability of alternative designs is one factor to be considered in determining whether a feature is functional, though alternative designs need not be considered if the feature has been conclusively shown to be functional pursuant to one of the above tests."); *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 213-14 (D. Conn. 2004) ("There is nothing to suggest that courts are prohibited from

10

considering design alternatives, but when functionality is apparent under the [traditional] test, the inquiry is over and the existence of design alternatives cannot resurrect an otherwise functional feature."); *Maharishi Hardy Blechman*, 292 F. Supp. 2d at 548 (noting that *TrafFix* was "an easy case of functionality"). Accordingly, if the functionality of Invisible Fence's coin slot can be conclusively established, then the Court need not consider its proffered alternatives.

Perimeter argues that the '900 Patent provides such conclusive evidence of functionality. In that regard, *TrafFix* held that under the traditional rule of functionality, "[a] utility patent is strong evidence that the features therein claimed are functional."[6] 532 U.S. at 29. Indeed, a utility patent is such strong evidence of functionality that "[w]here the . . . patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that it is merely an ornamental, incidental, or arbitrary aspect of the device."[7] *Id.* at 30.

Perimeter maintains that the '900 Patent claims the coin slot feature at issue here. Specifically, Perimeter contends that Claim 6 of the patent covers Invisible Fence's coin slot, as it provides for an external slot in the base of the battery holder "for receiving a tool to facilitate

---

[6] In fact, one commentator noted that the Supreme Court repeated the phrase "strong evidence" four times in its opinion to emphasize this point, and "at a fifth point, the court used the similar phrase 'strong evidentiary inference of functionality.'" McCarthy, § 7:89.

[7] Although the utility patent at issue in *TrafFix* had expired, whether a utility patent is still alive or has expired appears to bear little significance to the functionality inquiry. McCarthy, 7:89.1; *see also E-Z Bowz, L.L.C. v. Prof'l Prod. Research Co., Inc.*, No. 00 Civ. 8670(LTS)GWG, 2003 WL 22068573, at *22 (S.D.N.Y. Sept. 5, 2003) (applying *TrafFix* to an alive utility patent).

11

insertion of the battery holder into the electronic receiver." '900 Patent col. 10 l. 42-45.[8] According to Perimeter, because the feature at issue here is claimed by the '900 Patent, to demonstrate nonfunctionality Invisible Fence must produce evidence that the raised ridges are merely an ornamental, incidental, or arbitrary aspect of the Power Cap.

Invisible Fence ostensibly does not contest Perimeter's argument that the coin slot is claimed under the '900 Patent.[9] Instead, it attempts to distinguish the case at bar from *TrafFix*, arguing that in *TrafFix*, the feature at issue was specifically claimed in the utility patent but that in the case at bar, Claim 6 does not disclose the specific raised ridge design. Instead, Claim 6 provides a more general description of an external slot that receives a tool to facilitate insertion of the battery holder. Invisible Fence concludes that this distinction is enough for the Court not to apply the *TrafFix* presumption of functionality; however, Invisible Fence provides no legal support for its argument.

Indeed, a close review of *TrafFix* seemingly cuts against Invisible Fence's purported distinction. In *TrafFix*, the plaintiff sought trade dress protection for a dual spring design that kept temporary road signs upright in adverse wind conditions. 532 U.S. at 25. The Court noted that the dual spring design as disclosed in the patent looked "very different" from the plaintiff's trade dress. *Id.* at 30. The Supreme Court found this of no consequence, as the dual spring

---

[8] Although Figs. 8 and 9 depict the coin slot as an indentation into the base of the battery holder with no raised ridges, it is impermissible "to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention." *Id.* (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Accordingly, given the broad language of Claim 6, Figs. 8 and 9 do not limit the scope of the patent.

[9] Specifically, Invisible Fence maintains that "*the fact that the base of the battery was subject to one of the claims in the '900 Patent* does not preclude a claim for trade dress infringement . . . ." (Mem. in Opp'n 5 (emphasis added).)

feature fell within the claims of the patent, emphasizing as quoted above that "[a] utility patent is strong evidence that the features therein *claimed* are functional." *Id.* at 29-31. Accordingly, unless Invisible Fence can demonstrate that its coin slot is not claimed under the '900 patent, it will be subject to the heavy presumption of functionality. As noted above, Invisible Fence makes no such argument here, and there is no evidence before the Court to suggest that Claim 6 does not cover Invisible Fence's coin slot design.

Under the *TrafFix* framework, Invisible Fence must now produce evidence that the two raised ridges are an ornamental, incidental, or arbitrary aspect of the Power Cap in order to demonstrate that the feature is nonfunctional. When describing how a plaintiff might demonstrate that its feature is ornamental, incidental, or arbitrary, the Supreme Court explained that "the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent." *TrafFix*, 532 U.S. at 34. This could be accomplished by "going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention." *Id.*

Invisible Fence makes no attempt at arguing that its raised ridge design is ornamental, incidental, or arbitrary. In fact, examining the '900 Patent beyond Claim 6 reveals that the raised ridges are a useful part of the battery pack. The "Background of the Invention" provides that the purpose of the battery pack is to solve the problem of battery replacement by being removable. In order to facilitate this purpose, the raised ridges form a coin slot that allows a coin to be inserted and turned to either lock a new battery into place or to unlock and remove an old battery. Indeed, the "Detailed Description of the Preferred Embodiments" specifically details the usefulness of the coin slot, as the Description provides for an external slot that is "rounded

13

allowing the use of a coin to lock or unlock the battery pack." '900 Patent col. 9 l. 21-30. In other words, the ridges are not some "whimsical design," but rather they help to meet Invisible Fence's specific need of a removable battery pack. *Berlin Packaging, LLC v. Stull Techs., Inc.*, 381 F. Supp. 2d 792, 802 (N.D. Ill 2005). In sum, Invisible Fence produces no evidence that its raised ridges are ornamental, incidental, or arbitrary; instead, the '900 patent suggests otherwise. Accordingly, Invisible Fence fails to defeat the heavy presumption of functionality imposed by the '900 Patent.

In addition to the '900 Patent, Perimeter points to Invisible Fence's instruction manuals as independent evidence of functionality. For example, the manuals instruct that to remove an old battery pack, a coin is inserted *in the slot on top of the battery* and turned counter clockwise. Furthermore, to install a new Power Cap, a coin is again inserted *in the slot on the top of the battery* and turned clockwise until the battery is locked into place. The "Installation & Training Manual For The Invisible Fence AT950 In-Home Pet System" also includes a diagram that depicts a consumer inserting a coin into the raised ridges on the battery pack.

Perimeter cites no cases and provides little in the way of explanation to support its proposition that these materials provide independent evidence of functionality. Perhaps it derives its argument from the rule that "[i]f a seller advertises the utilitarian advantages of a particular feature, this constitutes strong evidence of functionality." McCarthy, § 7:74 & n.1 (collecting cases). Under this rule, the manuals do not constitute strong evidence of functionality, as their purpose is not to tout the utilitarian advantages of the ridges; rather they are general instruction

and service manuals regarding many of Invisible Fence's products.[10] *See Id.* ("To trigger this rule, the advertising must tout the utilitarian advantages of the feature claimed as trade dress, not some other aspect of the product.")

Furthermore, in advancing this argument, Perimeter seemingly confuses the colloquial definition of "functional" with its legal definition, arguing that the manuals "describe that the Power Cap slot is used to install the Power Cap, properly align the Power Cap, and remove or replace the Power Cap."[11] (Reply 6-7.) This argument merely focuses on the fact that the ridges forming the coin slot serve some use or purpose, not that they are "*essential* to the use or purpose" of the Power Cap.[12] *Logan Graphics Prods., Inc., v. Textus USA, Inc.*, No. 02 C 1823,

---

[10] Indeed, of the "Installation and Service 2002" manual's seventy-seven plus pages, only two are devoted to the Power Cap.

[11] In fact, some circuits have distinguished between a *de facto* functional feature and a *de jure* functional feature to delineate the differences between colloquial functionality and legal functionality: "In essence, de facto functional means that the design of a product has a function, i.e., a bottle of any design holds fluid. . . . De jure functionality means that the product has a particular shape 'because it works better in this shape.'" *Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 684-85 (6th Cir. 2006); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002); *Valu Eng'g*, 278 F.3d at 1274. Only de jure functional features are afforded trade dress protection. *See Fuji Kogyo*, 461 F.3d at 684-85.

[12] Perimeter also argues that trade dress protection is precluded here because Invisible Fence admits that the feature at issue serves "some function," which Perimeter contends is a concession of functionality. Taken in context, Invisible Fence maintains that "the fact that the feature at issue on the Invisible Fence battery pack serves some function is not enough." (Mem. in Opp'n 4.) Although Perimeter asserts that Invisible Fence's argument "is simply not the law" ( Reply 4), Invisible Fence's proposition is seemingly grounded in Seventh Circuit Case law, as that Court has ruled: "The fact that the feature at issue serves some function is not enough; to be functional in the trade dress sense, the feature must be 'necessary to afford a competitor the means to compete effectively.'" *Thomas & Betts*, 138 F.3d at 297 (quoting *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1188 (7th Cir. 1989)); *see also Nelson/Weather-Rite, Inc. v. Leatherman Tool Group, Inc.*, No. 93 C 2274, 1995 WL 669091, at *15 (N.D. Ill. Nov. 8, 1995) ("A product is not legally functional merely because a feature or features make the product more attractive to the consumer by serving some function.").

Furthermore, as mentioned above, there is a distinction between the legal definition of "functional" and the colloquial definition of "functional." Consequently, at least one court has found that a plaintiff's admission of "'some function' in the abstract" does not equal "an unqualified concession of functionality in line with this [legal] definition." *Keysone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 556 n.12 (W.D.N.Y. 2005).

Accordingly, giving Invisible Fence the benefit of every reasonable inference, its use of the phrase "some function" is not an admission of legal functionality precluding its trade dress infringement claim.

15

2002 WL 31870549, at *8 (N.D. Ill. Dec. 23, 2002) (concluding that the defendant's argument that the plaintiff "cannot possibly demonstrate non-functionality because every aspect of its [trade dress] has a use . . . is not an exactly correct definition of functionality.").

Although the instruction manuals are of limited value as a separate indicia of functionality, they ostensibly indicate that the ridges are not arbitrary, incidental, or ornamental under the utility patent analysis, as the manuals reveal the purpose of the ridges in installing and removing the battery pack. *See TrafFix*, 532 U.S. at 34.

Because the '900 Patent establishes that the raised ridges forming the coin slot are functional and because Invisible Fence proffers no other evidence of nonfunctionality, there is no need for the Court to consider Invisible Fence's proposed alternative designs. Indeed, "the mere existence of alternatives does not render a product nonfunctional." *Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co.*, 349 F. 3d 601, 604 (9th Cir. 2003). As a result, Invisible Fence fails to create a genuine issue of material fact that the feature at issue here is nonfunctional.[13]

### C. The Court Need Not Consider the Likelihood of Consumer Confusion

Finally, in an attempt to argue the second element of its trade dress claim, Invisible Fence contends in a most conclusory fashion that the study conducted by its expert evidences a likelihood of confusion among consumers between Invisible Fence's Power Cap and Perimeter's

---

[13] Even if the Court considered the alternative designs, it is unlikely that Invisible Fence's musings regarding two potential designs, without more, would create a genuine issue of material fact that its coin slot is nonfunctional. Invisible Fence posits only two alternative designs and provides no evidence that these designs would work as well as its raised ridges design. *See Switchmusic.com v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 820-21 (C.D. Cal. 2006) (quoting *Disc Golf Ass'n Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1008 (9th Cir. 1998) ("[T]he availability of alternative designs 'by itself is insufficient to prove nonfunctionality; there must be a sufficient number of alternative designs such that providing trademark protection to one design would not hinder competition.'"); *Allfast Fastening Sys. v. Briles Rivet Corp.*, 16 F. Supp. 2d 1154, 1162 (C.D. Cal. 1998) ("The existence of actual or potential alternative designs that work equally well strongly suggests that the particular design used is neither functional nor needed by competitors to effectively compete."); McCarthy § 7:75.

battery pack. However, Invisible Fence utterly fails to undertake any specific discussion regarding this element of a trade dress claim, including a failure to even mention the six factors pertinent to whether a likelihood of confusion exists between the trade dresses of the two products.[14]

Furthermore, because the Court concluded that Invisible Fence failed to create a genuine issue of material fact regarding the element of functionality, we need not address the question of consumer confusion here. *See Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 295 F. Supp. 2d 854, 882 (S.D. Ind. 2003) ("*TrafFix Devices* establishes beyond dispute that if the design or configuration in question is functional, then trademark protection is not available regardless of secondary meaning or the likelihood of confusion.")

## IV. CONCLUSION

In sum, Invisible Fence fails to create a genuine issue of material fact that the coin slot feature of its Power Cap is nonfunctional, and thus its trade dress claim must fail. Therefore, Perimeter's motion for summary judgment (Docket # 54) is GRANTED.

SO ORDERED

Enter for January 26, 2007

S/Roger B. Cosbey<br>
Roger B. Cosbey<br>
United States Magistrate Judge

---

[14] These elements include:
1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999).