UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **INVISIBLE FENCE, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | CAUSE NO. 1:05-CV-361 |
| ) | |
| **PERIMETER TECHNOLOGIES, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Plaintiff Invisible Fence, Inc. owns United States Patent Number 5,445,900 ("'900 Patent"), which patented a battery pack used to supply power to a receiver that attaches to an animal's collar and that generates a shock if the animal gets too close to a buried wire. Invisible Fence sued Defendant Perimeter Technologies, Inc. (Docket # 1), claiming that Perimeter infringed the '900 Patent by manufacturing and selling a similar battery pack.[1]

On October 4, 2006, Perimeter filed a motion for summary judgment, maintaining that its battery pack does not infringe the '900 Patent.[2] (Docket # 50.) On November 30, 2006, Invisible Fence filed a response, and Perimeter replied on December 15, 2006. (Docket ## 58, 60.)

For the following reasons, Perimeter's motion for summary judgment on the patent

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1338. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.
  Invisible Fence also sued Perimeter for trade dress infringement, trademark infringement, and unfair competition. (Compl. 2-8.) In an Opinion and Order dated January 26, 2007, the Court granted Perimeter's motion for summary judgment on the trade dress claim. (Docket # 68.) The parties concede in their briefings that only the patent claim remains.

[2] Perimeter also filed a separate motion for summary judgment on December 15, 2006, contending that certain claims in the '900 Patent are invalid. (Docket # 62.)

infringement claim will be GRANTED.

## I. FACTUAL BACKGROUND[3]

The patented invention at issue is a battery pack that powers an electronic receiver worn by an animal as part of an electronic pet containment system. *See* '900 Patent col.1 l.6-10 (filed Aug. 18, 1993). Invisible Fence specifically alleges that Perimeter manufactures a battery pack infringing claims 9 and dependant claims 11 and 14 of the '900 Patent.[4] Claim 9 reads as follows:

> 9. An electronic device comprising:
>    (a) a housing having a receptacle; and
>    (b) a battery pack removably insertable into the receptacle of the housing for supplying power to the electronic device including:
>        (1) a battery holder shaped for containing a battery having first and second terminals, the battery holder having an opening at one end and a generally closed base at the other end;
>        (2) a contactor having a spring located inside the battery holder between the base of the battery holder and the battery for biasing the battery toward the opening of the battery holder and at least one contact for electrical connection with the first terminal of the battery, the contact extending outside the opening of the battery holder for electrical connection with the electronic device; and
>        (3) a mounting connector on the battery holder for removably mounting the battery pack with the receptacle of the housing.

'900 Patent col.6 l.27-44.

The following figures illustrate the invention's preferred embodiment:

---

[3] For summary judgment purposes, the facts are recited in the light most favorable to Invisible Fence, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Insofar as Invisible Fence does not controvert the facts asserted by Perimeter in its "Statement of Material Facts," Perimeter's facts "are admitted to exist without controversy" as set forth below. *See* N.D. Ind. R. 56.1.

[4] In the '900 Patent, claim 14 is dependant on claim 11, which is dependant on claim 9. As the Court will conclude *infra*, Perimeter's battery pack does not infringe claim 9. Accordingly, the Court need not examine whether Perimeter infringed claims 11 and 14 since "dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed." *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1383 (Fed. Cir. 2000).



'900 Patent figs.2, 3, 8. Specifically, figure 2 depicts a perspective view of the battery pack, figure 3 depicts an "exploded" perspective view of the battery pack, and figure 8 depicts a cross-sectional view of the battery pack. '900 Patent col.3 l.30-35, 45-46. Moreover, the following reference numbers correspond to relevant elements of the invention: 26 identifies the battery pack; 28 identifies the contact arm; 30 identifies the retaining ring; 32 identifies the base; 44 identifies the contactor; 48 identifies the spring; and 50 identifies the battery. '900 Patent col.6

l.1-4, 8-11, 39-42.

After Perimeter provided several "true and accurate" representations of its battery pack to Invisible Fence, Invisible Fence placed reference numbers on these depictions to identify which elements of Perimeter's device corresponded to elements of Invisible Fence's patented invention. The following are depictions of Perimeter's battery pack with those references numbers:[5]



---

[5] Alternatively, Invisible Fence now maintains that the end it originally labeled "open end" is the base, while the end it originally labeled as the base (reference number 32) is the open end.

(Pl.'s Disclosure of Asserted Claims & Preliminary Infringement Contentions 2, Ex. C; Decl. of John J. Purtell ¶ 2.)

In addition, Invisible Fence employed the services of Dr. William G. Meyers, who works for Engineering and Consulting Services, to compare Invisible Fence's patented battery pack with Perimeter's battery pack. (Aff. of Dr. William G. Myers ("Myers Aff.") ¶¶ 1-3, 12.) Dr. Meyers noted that although the battery packs "are almost identical to the untrained eye," Perimeter's battery pack "has the spring loading mechanism at the cathode end rather than the anode end." (Meyers Aff. ¶¶ 13-14.) He concluded that this difference "has little or nothing to do with the basic function of the battery" because "[t]he biasing spring is there for good electrical contact and can just [as] easily been designed into the anode end . . . ." (Meyers Aff. ¶¶ 14-15.)

## II. PROCEDURAL BACKGROUND

After conducting a claim construction hearing, this Court entered an order on May 25, 2006, construing various terms of claim 9 as a matter of law. (Docket # 43.) Of significance to the current motion, the Court construed the following claim terms:

| TERM | CONSTRUCTION |
|---|---|
| "an opening" | "an opening of the battery holder at an end opposite the generally closed base" (Op. & Order 6-9.) |
| "closed base" | "an end of the battery holder that is opposite the opening" (Op. & Order 6-9.) |
| "a spring" | "a spring located between the base of the battery holder and the battery for biasing the battery toward the opening" (Op. & Order 14-16, 18.) |
| "biasing" | "exerting force in a particular direction toward the open end of the battery holder" (Op. & Order 9-11.) |
| "located inside" | "the spring must be positioned completely within the battery holder and is not exposed outside of the battery holder" (Op. & Order 18-19.) |
| "extending outside the opening" | "extending through and beyond the opening" (Op. & Order 23-25.) |

In light of this claim construction, Perimeter filed a motion for summary judgment, maintaining that its battery pack did not literally infringe the '900 Patent because its spring is located at the open end of the battery pack. Specifically, Perimeter argues that its spring is not located between the base of the battery holder and the battery, that its spring actually biases the battery *away* from the opening, and that its spring is not located wholly inside the battery holder. (Def. Perimeter Technologies, Inc.'s Mem. in Supp. of its Mot. for Summ. J. of Non-Infringement ("Mem. in Supp.") 11-13.)  Alternatively, Perimeter argues that its battery pack does not infringe under the doctrine of equivalents.

While Invisible Fence concedes that there is no literal infringement under the Court's claim construction, it maintains that Perimeter's battery pack infringes the '900 Patent under the doctrine of equivalents. (Mem. in Opp'n to Def.'s Mot. for Summ. J. of Non-Infringement ("Mem. in Opp'n") 1.) Specifically, Invisible Fence argues that Perimeter's spring performs substantially the same function as its patented battery pack (namely, maintaining good electrical contact between the battery and the electrical terminal of the receiver) in substantially the same way to achieve substantially the same result.

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.

1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

### A. General Principles

Patent infringement analysis involves two steps: (1) claim construction, which is a question of law, and (2) comparison of the construed claims to the accused product, which is a question of fact. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006). As discussed *supra*, the Court has already construed the disputed terms of the '900 Patent; accordingly, the current task is to compare that claim construction with Perimeter's battery pack to determine whether Perimeter infringed the '900 Patent.

To succeed on a claim of infringement, Invisible Fence must demonstrate that Perimeter's device "meets each claim limitation, either literally or under the doctrine of equivalents." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004). Here, Invisible Fence concedes that Perimeter's battery pack does not literally meet each claim limitation in the '900 Patent; instead, Invisible Fence maintains that the '900 Patent is infringed under the doctrine of equivalents.

The purpose of the doctrine of equivalents is to allow the patentee "to claim those

insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes."*Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1381 (Fed. Cir. 2005) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002)). Infringement occurs under the doctrine of equivalents when the "accused product contain[s] each limitation of the claim or its equivalent." *Id.* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). An equivalent is an insubstantial difference between an element of the accused product and the claim limitation and can result when the element of the accused device and the claim limitation "perform substantially the same function in substantially the same way to obtain substantially the same result." *Id.*; *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1313 (Fed. Cir. 2005).

Before the trier of fact decides whether the accused device infringes a patent under the doctrine of equivalent's function-way-result test, a court must first determine as a matter of law whether application of the doctrine has been proscribed by the "all elements rule." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1320-21 (Fed. Cir. 2003); *see also Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs*., No. 06-1102, 2007 WL 122038, at * 4, (Fed. Cir. Jan. 19, 2007) ("The court, as a matter of law, determines legal limitations on the application of the doctrine of equivalents."); *Abbott Labs. v. Andrx Pharm., Inc.*, 473 F.3d 1196, 1212 (Fed. Cir. 2007) ("[The plaintiff's] assertion that . . . it showed factual equivalence [under the function-way-result test] does not address [the defendant's] argument that [the plaintiff's] theory of equivalence is legally insufficient."). The all elements rule requires that "equivalence be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, *and that no limitation be read completely out of the claim*." *Depuy Spine, Inc. v.*

8

*Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1016 (Fed. Cir. 2006) (emphasis added). Thus, if a finding of infringement under the doctrine of equivalents "would entirely vitiate a particular claim[ed] element," then the all elements rule requires the court to find that there is no infringement. *Lockheed Martin*, 324 F.3d at 1321 (quoting *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1280 (Fed. Cir. 2001)).

"There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation and thereby violate the all [elements] rule." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1359 (Fed. Cir. 2005). Instead, "courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id.*

**B. Invisible Fence's Proposed Theories of Equivalence Would Vitiate Claim Limitations**

Although Invisible Fence concedes that there is no literal infringement of claim 9 as that claim has been construed by the Court, they do maintain, however, that Perimeter's battery pack infringes under the doctrine of equivalents. This argument depends upon the allegation that the springs in both Perimeter's battery pack and claim 9 perform substantially the same function (namely, to maintain good electrical connection between the battery and the electrical terminal of the receiver) in substantially the same way to obtain substantially the same result. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). The Court, however, never gets to this question if, as Perimeter stoutly maintains, Invisible Fence's theory of equivalents vitiates any claim limitation. *See Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002) ("[T]he question of insubstantiality of the differences is

9

inapplicable if a claim limitation is totally missing from the accused device.").

Before the Court examines the specific claim limitations that are allegedly vitiated, we note that when advancing its theory of equivalence, Invisible Fence contends that there are two plausible locations for the opening of Perimeter's battery pack. Of course, one possible location for the opening is the end where the retaining ring is located, which Invisible Fence originally identified as the "open end." Alternatively, Invisible Fence now maintains that the opening could be located at the opposite end of the battery pack, which it originally labeled as the base. Because it is apparent, however, that Invisible Fence's theory of equivalence vitiates claim elements no matter where the opening is located, the Court will accept for purposes of argument the alternative locations for the opening.

*1. Claim Limitations Are Vitiated Under Invisible Fence's Original Interpretation of Perimeter's Battery Pack*

According to Invisible Fence's original interpretation of Perimeter's battery pack, the opening is located at the same end as the retaining ring, and the base is located at the closed end labeled 32. Under this interpretation, the spring is positioned near the opening of the battery pack, which vitiates the following claim language: "[A] contactor having a spring *located inside the battery holder between the base of the battery holder and the battery for biasing the battery toward the opening of the battery holder* . . . ." '900 Patent col.11 l.36-39 (emphasis added).

Specifically, the Court construed the term "located inside" to mean that "the spring must be positioned completely within the battery holder and is not exposed outside of the battery holder." (Op. & Order 18-19.) Invisible Fence admits that the spring in Perimeter's battery pack is not completely positioned inside the battery holder. (Mem. in Supp. Ex. 5.) Thus, if the Court

10

were to accept Invisible Fence's equivalency theory, a battery pack could infringe claim 9 even if the spring was located outside the battery holder, thus impermissibly reading the claim limitation "located inside" out of claim 9.[6]

The Court also determined that the spring was "located between the base of the battery holder and the battery . . . ." (Op. & Order 14-16, 18.) Of course, as Invisible Fence admits, the spring in Perimeter's battery pack is not located between the base of the battery holder and the battery; rather, the spring is located at the opposite end of the battery pack, between the opening and the battery. (Mem. in Supp. Ex. 5.) Thus, if the Court were to accept Invisible Fence's equivalency theory, the claim limitation "between the base of the battery holder and the battery" would be read completely out of claim 9.[7]

Finally, the Court found that the spring as recited in claim 9 "bias[es] the battery toward the opening" (Op. & Order 14-16, 18) and construed the term "biasing" to mean "exerting force in a particular direction toward the open end of the battery holder." (Op. & Order 9-11.) In Perimeter's device, the spring biases the battery in the opposite direction, towards the base of the

---

[6] Perimeter also maintains that the language of claim 9 "specifically excludes" a spring located outside the battery holder. The doctrine of specific exclusion deems a particular structure "outside the reach of the doctrine of equivalents [when] that structure is clearly excluded from the claims whether the exclusion is express or implied." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345 (Fed. Cir. 2001). For example, the doctrine of specific exclusion applies when "the scope of the claim [is] limited in a way that plainly and necessarily exclude[s] a structural feature that [is] the opposite of the one recited in the claim . . . ." *Id.* at 1346.

Because this doctrine is "akin to the familiar rule that the doctrine of equivalents cannot be employed in a manner that wholly vitiates a claim limitation[,]" the Court need not engage in an independent analysis under the specific exclusion doctrine. *Id.* at 1346-47 ("The unavailability of the doctrine of equivalents could be explained either as the product of an impermissible vitiation of the . . . claim limitation, or as the product of a clear and binding statement to the public that [the] structures are excluded from the protection of the patent."). Nevertheless, claim 9 necessarily excludes a spring located outside the battery holder, as this is the opposite of a spring located inside the battery holder.

[7] Moreover, a spring located at the opening of the battery holder is specifically excluded from claim 9, which provides for a spring at the opposite end (i.e., the base) of the battery holder.

battery pack. Accordingly, if the Court were to accept Invisible Fence's equivalency theory, the claim limitation "for biasing the battery toward the opening of the battery holder " would be read completely out of claim 9.[8]

In short, Invisible Fence's equivalency theory is so broad that it impermissibly vitiates all the limitations in claim 9 that relate to the spring. *See Warner-Jenkinson*, 520 U.S. at 29 ("It is important to ensure that the application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."). If Invisible Fence "desired broad patent protection for any [spring] that performed a function similar to its claimed [spring], it could have sought claims with fewer structural encumbrances." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1425 (Fed. Cir. 1997). Instead, claim 9 describes a "*precise arrangement of structural limitations* that cooperate in a particular way to achieve a certain result," namely, to achieve a good electrical connection between the battery and the electrical terminal of the receiver. *Id.* (emphasis added). "Because the issued patent contains clear structural limitations, . . . [t]his [C]ourt will not effectively remove such . . . limitation[s]" from the patent using the doctrine of equivalents. *Id.* at 1425-26; *see also Depuy Spine*, 469 F.3d at 1018; *Street Flyers LLC. v. Gen-X Sports, Inc*., No. 01 Civ. 9669(MBM), 2003 WL 21998960, at *10-11 (S.D.N.Y. Aug. 23, 2003).

*2. Claim Limitations Are Vitiated Under Invisible Fence's Alternative Interpretation of Perimeter's Battery Pack*

Alternatively, Invisible Fence advances an equivalency argument that requires flipping

---

[8] Again, the specific exclusion doctrine applies, since the language of claim 9, which limits a spring to biasing the battery towards the opening, specifically excludes a spring that biases the battery in an opposite direction, that is, towards the base.

the labels for the "opening" and the "base." Under this alternative interpretation of Perimeter's battery pack, the end where the retaining ring is located is now labeled the base end, with the opening located at the closed end of the battery pack. Because under this labeling the spring is at the base of the battery pack, the spring is now "located between the base of the battery holder and the battery," and it also biases the battery towards the "opening." Thus, Invisible Fence avoids the vitiation problems discussed *supra* with respect to its original interpretation of Perimeter's battery pack. However, flipping the ends of Perimeter's battery pack does not alter the spring's location outside the battery holder. Thus, Invisible Fence's alternative interpretation still reads out the limitation "located inside" from claim 9. Furthermore, as discussed below, additional claim limitations are vitiated under this alternative interpretation.

Claim 9 recites that the contactor has "a spring . . . and at least one contact . . ., *the contact extending outside the opening of the battery holder* for electrical connection with the electronic device . . . ." '900 Patent col.11 l.36-44 (emphasis added). The Court construed "extending outside the opening" to mean "extending through and beyond the opening." (Op. & Order 23-25.) Invisible Fence concedes that under this construction, "[t]he contacts do not extend 'through' the opening since the opening is covered . . ."[9] (Mem. in Opp'n 11.) Indeed,

---

[9] Nevertheless, Invisible Fence argues that "[t]he contacts do extend 'beyond' the opening in the sense that the claim language does not define a particular direction of extension . . . ." (Mem. in Opp'n 11.) Apparently, Invisible Fence is contending that instead of extending "through *and* beyond" the opening, it is permissible under claim 9 for the contact to extend "through *or* beyond" the opening. This is essentially the same argument that Invisible Fence advanced, and that the Court rejected, during claim construction.
    Specifically, Invisible Fence maintained during claim construction that the contact arm is not required to extend through the opening of the battery holder; rather, it argued that the contact arm must only "extend from the battery holder in an area outside the opening, such that the one or more contacts can electrically connect with the electronic device." (Pl.'s Opening Br. on Claim Construction 32.) The Court rejected this argument, opining that "Invisible Fence's proposed construction would read the term 'the opening' out of the claim, rendering it essentially superfluous, whereas the claim itself necessarily entails that the contact arms will extend through the opening to reach outside the battery holder." (Op. & Order 24.)

instead of extending through and beyond the opening, the contact arms in Perimeter's battery pack ostensibly extend through and beyond the base. Accordingly, because Perimeter's contact arms do not extend outside the end that Invisible Fence now labels as the opening, Invisible Fence's proposed theory of equivalence would read the limitation "extending outside the opening of the battery holder" out of claim 9.

Finally, claim 9 provides that the battery holder has "an opening at one end and a generally closed base at the other end . . . ." '900 Patent col.11 l.33-35. The Court construed the term "an opening" to mean "an opening of the battery holder at an end opposite the generally closed base," and the term "closed base" to mean "an end of the battery holder that is opposite the opening." (Op. & Order 6-9.) Under this claim construction, it is clear that the end of Perimeter's battery pack numbered 32 is not "an opening"; rather, this end is closed, which is akin to the "closed base" recited in claim 9.[10] Conversely, the end of the battery pack that Invisible Fence now claims is the base is not "closed" but open, which is akin to "an opening" as recited in claim 9.[11]

---

[10] During claim construction, Perimeter argued that the opening should be construed as the end through which the battery is inserted. Although the Court ultimately rejected this argument, Invisible Fence now apparently wishes to adopt its opponent's unsuccessful proposition, arguing that the end of Perimeter's device labeled 32 must be the opening because it is the end through which the battery is inserted. However, the Court found during claim construction that "[a]ny requirement . . ., which limits the insertion of the battery [to the opening] is clearly not found in claim 9 or the written specifications." (Op. & Order 8.) In fact, the Court posited that "the battery could be inserted *through the base* before it is ultrasonically welded to the tubular sidewall," (Op. & Order 8 (emphasis added)), which is exactly how the battery is inserted in Perimeter's battery pack.

[11] Morever, the retaining ring in Perimeter's device is attached at the end labeled by Invisible Fence as the base, which is inconsistent with the battery pack recited in the '900 Patent. Although claim 9 does not specifically provide for a retaining ring, the Summary of the Invention describes the retaining ring as mounted "at the opening of the battery holder." '900 Patent col.2 l.21; *see C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole [such as the Summary] . . . are more likely to support a limiting definition of a claim term."); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) ("Those statements, some of which are found in the 'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions . . . .").

Nevertheless, Invisible Fence suggests that this Court's claim construction permits the retaining ring to be

14

Under Invisible Fence's proposed equivalency theory, the limitations "an opening" and "closed base" are empty terms, since any end could be either the opening or the base regardless of whether that end was in fact open or closed.[12] If Invisible Fence desired such broad patent protection, "it could have sought claims with fewer structural encumbrances." *Sage Prods.*, 126 F.3d at 1425.  Instead, Invisible Fence's proposed theory of equivalence impermissibly vitiates the limitations in claim 9 requiring "an opening" and a "closed base."[13]

In sum, Invisible Fence's alternative interpretation of Perimeter's battery pack, in which

---

attached to the base, arguing that the Court found it "impermissible to limit the definition of the term 'opening' to coincide with the central aperture of the retaining ring." (Mem. in Opp'n 10.) This argument, however, takes the Court's claim construction out of context. During claim construction, the parties never disputed the location of the retaining ring at the opening; rather, their conflict centered around how the retaining ring defines the opening. Specifically, Invisible Fence asserted that once the retaining ring is ultrasonically welded to the tubular sidewall, *see* '900 Patent col.7 l.44-47, the opening and the central aperture of the retaining ring become "one in the same." (Pl.'s Opening Br. on Claim Construction 10.) Perimeter countered that the opening and the central aperture cannot be coincident with one another, since the central aperture is necessarily smaller than the opening in order to retain the battery within the holder. The Court agreed with Perimeter that the retaining ring does not define the opening and that the central aperture and the opening were not, as Invisible Fence had suggested, the same thing.

[12] The Court notes that Invisible Fence's current construction of claim 9's language, whereby "an opening" can be closed and a "closed base" can be open, was not advanced during the claim construction phase of the patent litigation. Indeed, such a construction is directly opposed to the ordinary meaning of the terms "opening" and "closed" and finds no support in the specification or file history. *See Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1376-77 (Fed. Cir. 2005) ("Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996))). Consequently, on this record, the best authority to support such a reading comes to us from the pen of Lewis Carroll:

> "When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean-neither more nor less."
>
> "The question is," said Alice, "whether you can make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master-that's all."

Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 219 (George Stade ed., 2004) (1871) (emphasis in original).

[13] Furthermore, claim 9's provision for "an opening" specifically excludes the opposite of an opening, i.e., a closed end. Similarly, claim 9's provision for "a generally closed base" specifically excludes a closed base's opposite, i.e., an open base.

15

the base is the end where the spring and retaining ring are located, reads the following claim limitations out of claim 9: "located inside," "the contact extending outside the opening of the battery holder," "an opening," and "closed base."

## V. CONCLUSION

Invisible Fence sets forth two possible locations for the open end of Perimeter's battery pack, arguing that each infringes the '900 Patent under the doctrine of equivalents. Originally, Invisible Fence labeled the opening as the end where the retaining ring is located; alternatively, Invisible Fence proposed that the opening was located at the opposite end of Perimeter's battery pack. Because under either interpretation, Invisible Fence's theory of equivalence vitiates specific limitations in claim 9 as a matter of law, the Court need not submit this case to the trier of fact for a determination of infringement. Accordingly, Perimeter's motion for summary judgment on the issue of patent infringement is GRANTED.

SO ORDERED.

Enter for March 2, 2007

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge